IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DOUGLAS J. WINSTON,

               Petitioner,                No. 2: 08-cv-2914 WBS KJN P

    vs.

R. K. WONG,

               Respondent.            FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1976, petitioner was convicted of first degree murder, kidnapping, burglary, robbery and attempted robbery. Petitioner is serving a sentence of seven years to life in prison.

In the instant action, petitioner challenges the 2006 decision by the California Board of Parole Hearings ("BPH") finding him unsuitable for parole. According to the petition, this was petitioner's sixteenth suitability hearing. (Dkt. 1, at 9 of 107.) This action is proceeding on the petition filed by petitioner on November 21, 2008. (Dkt. No. 1) Petitioner alleges that there was insufficient evidence to support the BPH's 2006 decision finding him unsuitable for parole.

1    After carefully considering the record, the undersigned recommends that the

2    petition be denied.

3    II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

4    In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

5    the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

6    Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

7    court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

8    Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly

9    established law applies to two situations:  (1) where the state court legal conclusion is opposite

10   that of the Supreme Court on a point of law; or (2) if the state court case is materially

11   indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

12   opposite.

13   "Unreasonable application" of established law, on the other hand, applies to

14   mixed questions of law and fact, that is the application of law to fact where there are no factually

15   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16   Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

17   to state court decisions.  While the deference is not blindly automatic, "the most important point

18   is that an unreasonable application of federal law is different from an incorrect application of

19   law. . . .  [A] federal habeas court may not issue the writ simply because that court concludes in

20   its independent judgment that the relevant state-court decision applied clearly established federal

21   law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

22   11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

23   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

24   authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

25   "Clearly established" law is law that has been "squarely addressed" by the United

26   States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

settled law to unique situations will not qualify as clearly established.  See <u>e.g.</u>, <u>Carey v. Musladin</u>, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority, in arriving at their decision.  <u>Early v. Packer</u>, 537 U.S. 3 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  <u>Id</u>.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  <u>Early v. Packer</u>, 537 U.S. at 9.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).

III.  <u>Discussion</u>

A. <u>Legal Standard</u>

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law."  U .S. Const. amend. XIV, § 2.  A person alleging a due process violation must demonstrate that he or she was deprived of a protected liberty or property interest, and then

1  show that the procedures attendant upon the deprivation were not constitutionally sufficient.

2  Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan,

3  306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due

4  Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

5  In the context of parole, the United States Constitution does not, in and of itself, create a

6  protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van

7  Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses

8  mandatory language, it "'creates a presumption that parole release will be granted' when or

9  unless certain designated findings are made, thereby giving rise to a constitutional liberty

10  interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S.

11  1, 12 (1979)).

12          Under California law, prisoners serving indeterminate prison sentences "may

13  serve up to life in prison, but they become eligible for parole consideration after serving

14  minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417

15  (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board

16  will set a parole release date "in a manner that will provide uniform terms for offenses of similar

17  gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal.4th 1181,

18  1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)).  A release date will not be

19  set, however, if the Board determines "that the gravity of the current convicted offense or

20  offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

21  consideration of the public safety requires a more lengthy period of incarceration. . . ." Cal.

22  Penal Code § 3041(b).

23          California state prisoners who have been sentenced to prison with the possibility

24  of parole have a clearly established, constitutionally protected liberty interest in receipt of a

25  parole release date.  Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v.

26  Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d

4

1123, 1128 (9th Cir. 2006)); <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003); <u>McQuillion</u>, 306 F.3d at 903.

In the context of parole proceedings, it is well established that inmates are not guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process Clause. <u>See</u> <u>Pedro v. Or. Parole Bd.</u>, 825 F.2d 1396, 1398-99 (9th Cir. 1987). Nonetheless, inmates are afforded limited procedural protections. The Supreme Court has held that a parole board's procedures are constitutionally adequate so long as the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. <u>Hayward v. Marshall</u>, 603 F.3d 546, 560 (9th Cir. 2010) (quoting <u>Greenholtz</u>, 442 U.S. at 16). As a matter of state constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. <u>Hayward</u>, 603 F.3d at 562 (citing <u>In re Rosencrantz</u>, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); <u>see</u> <u>also</u> <u>In re Lawrence</u>, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some evidence" that an inmate "poses a current risk to public safety"); <u>In re Shaputis</u>, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of [the] state," <u>Cooke v. Solis</u>, 606 F.3d 1206, 1213 (9th Cir. 2010), petition for cert. filed, 79 U.S.L.W. 3141 (U.S. Sept. 2, 2010) (No. 10-333), and compliance with this evidentiary standard is, therefore, mandated by the federal Due Process Clause. <u>Pearson v. Muntz</u>, 625 F.3d 539, 549 (9th Cir. 2010). Thus, a federal court undertaking review of a "California judicial decision approving the . . . decision rejecting parole" must determine whether the state court's decision "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." <u>Irons</u>, 505 F.3d at 851. The court must

look to California law to determine what findings are necessary to deem a petitioner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by "some evidence" or whether it constituted an unreasonable application of the "some evidence" principle. Id.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for convicted murderers. The regulation is designed to guide the Board's assessment regarding whether the inmate poses an "unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. In re Lawrence, 44 Cal.4th at 1202. The Board is directed to consider all relevant, reliable information available, including the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. 15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 Cal. Code Regs. § 2402(c)-(d). Factors tending to show unsuitability include:

> (1) The Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> >
> > (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> >
> > (C) The victim was abused, defiled, or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

Factors tending to show suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

1    (7) Age.  The prisoner's present age reduces the probability of
     recidivism.

2

3    (8) Understanding and Plans for Future.  The prisoner has made realistic
     plans for release or has developed marketable skills that can be put to use
     upon release.

4

5    (9) Institutional Behavior.  Institutional activities indicate an enhanced
     ability to function within the law upon release.

6    (15 Cal. Code Regs. § 2402(d).)

7            The overriding concern is public safety, In re Dannenberg, 34 Cal.4th at 1086, and

8    the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205.  Thus,

9    under California law, the standard of review is not whether some evidence supports the reasons

10   cited for denying parole, but whether some evidence indicates that a parolee's release would

11   unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th at 1241.  Therefore, "the

12   circumstances of the commitment offense (or any of the other factors related to unsuitability)

13   establish unsuitability if, and only if, those circumstances are probative to the determination that

14   a prisoner remains a danger to the public."  In re Lawrence, 44 Cal.4th at 1212.  In other words,

15   there must be some rational nexus between the facts relied upon and the ultimate conclusion that

16   the prisoner continues to be a threat to public safety.  Id. at 1227.

17           B.  Analysis

18           The California Court of Appeal was the last state court to issued a reasoned

19   decision addressing the claim raised in the instant petition.  (Dkt. No. 1, at 99-106.)

20   Accordingly, the undersigned considers whether the denial of petitioner's claim by the state

21   appellate court was an unreasonable application of clearly established Supreme Court authority.

22   Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (when reviewing a state court's

23   summary denial of a claim, the court "looks through" the summary disposition to the last

24   reasoned decision.)

25   ////

26   ////

1      The California Court of Appeal denied petitioner's claim for the reasons stated

2   herein:

3          The petition for writ of habeas corpus has been read and
            considered.
4
            The petition is denied for failure to state sufficient facts or to
5           provide an adequate record or legal authority demonstrating
            entitlement to the relief requested.  There is significantly more than
6           "some evidence" to support the findings of the Board of Prison
            Terms.  (See In re Dannenberg (2005) 34 Cal.4th 1061, 1071.)
7

8   (Dkt. No. 1, at 104.)

9      The Los Angeles County Superior Court issued a more detailed reasoned opinion

10  addressing petitioner's claims:

11         The Court has read and considered the Petition for Writ of Habeas
            Corpus filed by Petitioner on October 10, 2006.  Having
12          independently reviewed the record, giving deference to the broad
            discretion of the Board of Parole Hearings ("Board") in parole
13          matters, the Court concludes that the record contains "some
            evidence" to support the Board's findings that Petitioner is
14          unsuitable for parole.  See Cal. Code Reg., tit. 15, § 2402; In re
            Rosenkrantz (2002) 29 Cal.4th 616, 667.
15
            Petitioner was received in the Department of Corrections on June
16          25, 1976 after a conviction of kidnapping for robbery (Penal Code
            § 209).  He was also convicted of ten other counts, including three
17          counts of first degree murder, five counts of first degree burglary,
            and one count of first degree robbery, and one count of attempted
18          robbery.  He was sentenced to a term of life imprisonment.

19          The record reflects that the body of James Munsford was
            discovered in an alley on December 29, 1974.  He had been shot in
20          the back of the head and his money, keys, and wallet had been
            taken.  Police investigation revealed that Petitioner and his crime
21          partners, Michael Lawrence and William Clifford, had kidnapped
            Munsford in order to rob him, took his property, killed him, and
22          placed his body in the trunk of his car.  When police went to
            Munsford's home to notify next of kin and conduct further
23          investigation, they were admitted by three-year-old Dennis
            Munsford, who was naked and crying.  The child pointed out the
24          body of his mother, Mary Anne Munsford, the wife of James
            Munsford.  She had been raped and shot in the head.  Her hands
25          had been bound with an electrical cord and a blood-soaked bath
            towel was around her head.  The residence had been ransacked and
26          the stereo system, money, and other items had been taken.  It is not

9

clear whether Mary Anne Munsford was killed before or after her husband.  Petitioner was convicted of kidnaping for robbery in connection with the James Munsford incident, and it is the life crime for purposes of calculating his sentence.  He was also convicted of two counts of first degree murder with use of a firearm for the murders of James Munsford and Mary Anne Munsford, and one count of burglary.

On December 28, 1974, the day before the discovery of the Munsford crimes, the body of L.C. Putthoff, an elderly woman, was found at her home.  The house had been burglarized by Petitioner and his crime partner Michael Lawrence.  Ms. Putthoff had been killed by multiple stab wounds with a kitchen knife inflicted by Petitioner.  Property belonging to the victim was recovered from Petitioner's house, along with a bloody glove from the murder.  Petitioner was convicted of first degree murder and burglary in connection with this incident.

On January 7, 1975, Clayton and Mary Halavijan returned home from church to find their residence burglarized.  The front door was open and the light was on.  The television set, clothes and food from the refrigerator were missing.  Police investigation revealed that the burglary was committed by Petitioner, Lawrence, Clifford, and Alrey Atkins.

Also on January 7, 1975, Petitioner, Lawrence, Clifford, and Atkins decided to rob a grocery store owned by Faye Lau.  Petitioner and Clifford entered the store.  In the course of the robbery, there was a scuffle in which the victim, Lau, began throwing objects.  Clifford backed out the door, firing into the store.  He shot Lau in the lower abdomen and left buttock, and accidentally shot Lawrence in the right calf.

In the early morning hours of January 8, 1975, Edwin Levin heard his dog barking.  He grabbed his gun and went to the back of his house.  He saw a man coming through the door with a rifle.  Levin shot at the man with his revolver and the man returned fire.  Another man attempted to grab Levin's gun, but Levin got him in a head lock.  Levin was hit on the head in the struggle and received a cut that required 28 stitches.  A purse, wallet, and $900 in cash were taken from the house.  Police investigation showed that the crime was committed by Petitioner, Lawrence, and Clifford, and that Petitioner was the man who struck Levin in the head.

The Board found petitioner unsuitable for parole after a subsequent parole consideration hearing held on April 20, 2006.  Petitioner was denied parole for one year.  The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  The Board based its decision primarily on Petitioner's commitment offense.

10

The Court finds that there is some evidence to support the Board's finding that Petitioner is unsuitable for parole on the grounds that the offense was carried out in a manner that showed an exceptionally callous disregard for human suffering, it was carried out in a dispassionate and calculated manner, and the motive for the crime was very trivial in relation to the offense.

The record provides ample evidence that the commitment offense was carried out in manner that showed an exceptionally callous disregard for human suffering.  The life-crime was part of a two-week crime spree that included three first degree murders, five first degree burglaries, a robbery, and an attempted robbery.  The circumstances surrounding the kidnapping and murder of James Munsford were harrowing.  The victim was last seen leaving a party.  He was found dead in an alley, shot in the head, and his keys, money and wallet were missing.  Petitioner apparently drove his crime partners in the victim's car to the Munsford residence, where the victim's wife, Mary Anne Munsford, was raped and murdered in front of her toddler.  The house had been burglarized.  Not only were both of three-year-old Dennis Munsford's parents killed, but the child witnessed the invasion of his home and the rape and murder of his mother before being left alone in the house with his mother's bloody and violated corpse.  The depraved, brutal and violent nature of the commitment offense and the associated crimes shows an exceptionally callous disregard for human suffering and supports a finding that Petitioner is unsuitable for parole based on the commitment offense.  Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D).

In addition, the commitment offense and associated crimes were committed in a dispassionate and calculated manner.  The robbery, burglary and murders of the Munsfords were not spontaneous, spur-of-the-moment crimes, but were part of a series of burglaries and robberies.  Petitioner and his accomplices kidnapped, robbed, and killed James Munsford in order to take his property.  He was shot execution-style in the back of the head, as was his wife, Mary Anne Munsford.  Moreover, in the absence of evidence indicating that the victims resisted or posed any physical threat to Petitioner and his accomplices, it appears that the Munsfords were murdered to facilitate the property crimes and to eliminate witnesses.  The shootings of Mr. And Mrs. Munsford were therefore carried out in a cold and calculating fashion that indicated deliberation and planning.  The dispassionate and calculated manner in which the crimes were committed is a further ground for finding Petitioner unsuitable for parole.  Cal. Code Regs., tit. 15, § 2402(c)(1)(B).

Finally, the motive for the crime, robbery, was very trivial in relation to the offense.  James Munsford was kidnapped for the purpose of taking his car, money and wallet.  Killing him was unnecessary to completing the robbery.  Killing and raping Mary Anne Munsford was likewise unnecessary to completing the

burglary of her home.  Most of the crimes of which Petitioner was convicted involved a high level of violence and a willingness to use deadly force to effectuate the taking of property.  The taking of property is a very trivial motive for shooting, stabbing, terrorizing, and taking the life of another human being.  The very trivial underlying motive for the crimes in relation to the gravity and violence of the kidnapping and murder offenses supports a finding that Petitioner is unsuitable for release on parole.  Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(E).

The Board also found that Petitioner had not upgraded himself vocationally or educationally since his previous parole hearing, nor had he engaged in additional self-help programming.  He had also incurred a new CDC-115 violation since the previous hearing, for refusing to obey a direct order.  A prisoner's institutional behavior and activities can indicate whether he has improved his ability to function within the law upon release.  Petitioner's failure to improve educationally and vocationally and to pursue self-help opportunities, while not by itself a basis for finding Petitioner unsuitable for parole, is part of the relevant information considered by the Board and the Court in determining his suitability.  The Court finds that Petitioner's failure to program sufficiently in the current review period contributes to a pattern of behavior that indicates unsuitability for parole at this time.

Based on its review of the record, the Court finds "some evidence" in the circumstances of the commitment offense that Petitioner presents an unreasonable risk of danger to society or a threat to public safety if released, and he is therefore not suitable for release on parole at this time.

(Dkt. No. 1, at 100-02.)

Based on the reasoning of the Los Angeles County Superior Court, the undersigned finds that the BPH's characterization of petitioner's commitment offenses, i.e. they showed an exceptional disregard for human suffering, were carried out in a dispassionate manner, and that the motives were trivial, was supported by the record.  The undersigned next considers whether the factors of petitioner's offense were probative of his current dangerousness.

The 2006 hearing was petitioner's sixteenth suitability hearing and petitioner had been in prison for thirty years at the time of the hearing.  Nevertheless, the circumstances of the offenses were probative of petitioner's current dangerousness based on his failure to adequately program while in prison and the unfavorable 2002 psychological report.  The undersigned will

12

1  below discuss these factors, as well as other post-commitment factors, relied on by the BPH in

2  2006.

3          First, the BPH found petitioner unsuitable because he had programmed

4  insufficiently since being incarcerated.  (Dkt. No. 1, at 63.)  The BPH noted that petitioner had

5  years ago obtained his high school diploma while in prison, but had not progressed further with

6  his educational work since that time.  (Id.)  The BPH stated that petitioner had limited vocational

7  skills, with a vocational certification in only shoe repair.  (Id.)  Petitioner had not participated in

8  any self-help programs since his last suitability hearing.  (Id.)

9          In his traverse, petitioner argues that the BPH's findings regarding his limited

10 programming were inaccurate.  Petitioner argues that his 1992 Life Prisoner Evaluation Report

11 shows that after obtaining his high school diploma, he subsequently enrolled in college and

12 completed three courses.  In his traverse, petitioner further argues that the 1992 Life Prisoner

13 Evaluation Report states that he had gotten involved in some vocational training programs which

14 included electronics technology, shoe manufacturing, shoe repair and date processing.  Petitioner

15 also states that this report goes on to note his participation in self-help programs including group

16 therapy, NA and AA.

17         A copy of the 1992 Life Prisoner Evaluation Report is attached to the petition.

18 (Id., at 73-76.)  This report contains the information alleged in the traverse.  However, this report

19 was prepared fourteen years before the 2006 suitability hearing.  In 2006, the BPH was concerned

20 that petitioner had not upgraded vocationally and educationally in many years.  His only

21 vocational certification was in shoe repair.  (Dkt. No. 1, at 43.)  The BPH was also concerned

22 that petitioner had not recently participated in self-help programs.  The BPH's finding that

23 petitioner had not sufficiently upgraded vocationally or educationally or had recently participated

24 in self-help programs was supported by the record.

25         The BPH next found petitioner unsuitable based on his disciplinary record.

26 Petitioner had received a rules violation report for disobeying a direct order since his last

1   suitability hearing.  (Id.)  The BPH also noted that petitioner had six serious disciplinary

2   violations and seven counseling chronos.  (Id.)

3           In the traverse, petitioner argues that his 2005 rules violation conviction for

4   disobeying an order was not some evidence of his current dangerousness.  At the suitability

5   hearing, the BPH stated that petitioner's conviction was based on his "eating on the job."  (Id., at

6   33.)  The record does not contain a copy of the rules violation report.  For this reason it is

7   difficult to determine whether this conviction involved serious misconduct. (15 Cal. Code Regs.

8   § 2402(c)(6) (prisoner engaging in serious misconduct tends to show unsuitability).

9           The BPH found that petitioner's overall disciplinary record demonstrated that he

10  was unsuitable for parole.  Petitioner's last rules violation conviction before his 2005 conviction

11  was in 1997 for possession of morphine.  (Dkt. No. 1, at 33.)  His last counseling chrono was in

12  2001 when he failed to respond to a docket for a TABE test.  (Id.)  If the 2005 conviction was not

13  based on "serious misconduct," the undersigned would have difficulty finding that petitioner's

14  disciplinary history was some evidence of his current dangerousness.  For these reasons, the

15  undersigned makes no findings regarding whether the BPH properly relied on petitioner's

16  disciplinary record to find him unsuitable.

17          The BPH found petitioner unsuitable based on his last psychological report from

18  2002 which stated that his level of dangerousness was moderate to low compared to other

19  inmates.  (Id.)

20          In the traverse, petitioner argues that the 2002 psychological report was actually

21  favorable.  Petitioner refers to the report, a portion of which is attached as an exhibit to the

22  petition.  Petitioner cites the following comments in the 2002 report:

23              Given his plans on release to the community and his planned
                association with his wife and his sister, neither of whom are
24              involved in criminal activity, his level of dangerousness would be
                considered moderate to low in comparison with other inmates on
25              parole.  Mr. Winston's age also plays a significant role in
                determining that he would most likely represent lower risk than in
26              the past to the community should he be released.

1    ****

2    Mr. Winston's crime was committed when he was young.  He
     appeared to have a significant conduct disorder, most probably
3    exacerbated by his use of substances during those youthful years.
     The crimes for which he is doing time were committed when he
4    was approximately 19 or 20 years old.

5    Mr. Winston does not have any significant psychiatric disorder at
     this time.  Behaviors representative of an Antisocial Personality as
6    noted in the 1998 report appear to be significantly remitted.  He
     appears to have made gains in maturity and behavior while in
7    prison.  He will most likely retain these gains when paroled.  His
     potential for violence in the community is considered to be average
8    to below average in comparison with the general prison population.

9    (Id., at 71.)

10            While the psychologist's comments regarding petitioner were overall positive, she

11   still concluded that his level of dangerousness was moderate to low and average to below the

12   average prison population.  In other words, the psychologist did not find that petitioner's level of

13   dangerousness was low.  For these reasons, the BPH did not improperly rely on this report in

14   finding petitioner unsuitable.[1]

15            The BPH also noted that petitioner did not have acceptable employment plans,

16   because his marketable skills had "perished" and he had failed to renew them.  (Id., at 64.)  In the

17   traverse, petitioner argues that he received certification in shoe repair in 1988, re-entered this

18   program in 2000, and completed it a second time in 2003.  While this assertion may be true, the

19   fact that petitioner had obtained only one vocational certification in his thirty years of

20   imprisonment demonstrated a lack of marketable skills.  The BPH properly relied on this factor

21   in finding petitioner unsuitable for parole.

22            The BPH also found that petitioner lacked insight.  (Id.)  In making this finding,

23   the BPH noted that at the last suitability hearing, petitioner was told that he could bring book

24   ────────────

25   [1]  The undersigned observes that at the 2006 hearing, the BPH relied on a psychological
     report that had been prepared four years earlier.  At some point, continued reliance on this
26   psychological report by the BPH is no longer some evidence of petitioner's current
     dangerousness.

1    reports to the suitability hearings to show the BPH what he was learning, but that he failed to do

2    this.  (Id., at 64-65.)  The BPH also noted that petitioner had failed to obtain any positive chronos

3    since his last suitability hearing, as he had been advised to do.  (Id., at 65.)  The BPH also

4    commented, "You seem emerged in finding a way [out of] prison by reading law books versus a

5    more rehabilitated route to displaying that you are not an unreasonable risk."  (Id.)

6            In the traverse, petitioner challenges the BPH's finding that he lacked insight.

7    Petitioner argues that the 2002 psychological report stated that his judgment and insight were

8    good.  While this assertion is true (id., at 70), the BPH's finding that petitioner lacked insight

9    was supported by their accurate observation that he seemed more intent on finding a way to get

10   out of prison by reading law books rather than through rehabilitation.  The BPH properly relied

11   on this factor when finding petitioner unsuitable.

12           Finally, petitioner argues that the BPH improperly found him unsuitable because

13   he failed to prepare book reports, as he had been advised to do at his previous suitability hearing.

14   Petitioner's failure to prepare the book reports was evidence of his lack of insight and failure to

15   engage in self-help.  The BPH did not improperly rely on petitioner's failure to prepare book

16   reports in finding him unsuitable.

17           For the reasons discussed above, some evidence supported the decision by the

18   2006 BPH that petitioner remained a danger if released on parole.  Petitioner's lack of recent

19   programming, which showed a lack of insight, and the 2002 psychological report demonstrated

20   that the circumstances of his commitment offense were still probative of his current

21   dangerousness.  The denial of petitioner's habeas corpus petition by the California Court of

22   Appeal challenging the 2006 suitability decision was not an unreasonable application of clearly

23   established Supreme Court authority.

24   IV.  Conclusion

25           The undersigned recommends that petitioner's application for a writ of habeas

26   corpus be denied.  If petitioner files objections, he shall also address whether a certificate of

16

appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  January 14, 2011

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

win2914.157

17